Good morning, ladies and gentlemen. We're pleased to have Judge Michael Regan of the Southern District of Illinois sitting with us today. Judge Regan, welcome. Thank you. Our first case for argument this morning is the Commodity Futures Trading Commission v. Battoo. We have the appeal of Hadley Chilton. Thank you, Your Honor. Good morning. May it please the Court, Counsel. Appellants have taken this appeal of the District Court's September 4, 2014 order denying their motion to modify the District Court's September 2012 order for preliminary injunction. The preliminary injunction underlying this appeal started with the CFTC's earlier complaint in motion for a statutory restraining order alleging violations of the Commodities Exchange Act. In September of 2012, based on uncontested allegations of wide-scale fraud, the District Court granted the CFTC's preliminary injunction, finding that it was necessary to preserve the status quo, to protect the defendant's alleged victims from further damage, and to minimize the danger of further violations of law by the defendants. However, by the time of the filing of the appellant's motion to modify almost two years later, that danger had all but dissolved. The BVI liquidator's appointment had been confirmed by the BVI courts pursuant to the- It would help us generalists if, instead of using weird acronyms, you used normal English words. Yes, Your Honor. Let me try. The British Virgin Islands liquidators' appointment had been confirmed by the British Virgin Island courts pursuant to an insolvency act in the British Virgin Islands of 2003. And they had begun collecting the assets of these funds that were the British Virgin Island funds under BVI law and under the supervision of the High Court of the BVI, the British Virgin Islands. In addition, the District Court, recognizing this- You say under the supervision of the British Virgin Islands High Court. Exactly what role does the court have dealing with the receiver? Well, the receiver, or the liquidators in this case, are fiduciaries and the court, they have to seek permission of the court, for example, to go and collect the assets. In this particular case, they sought recognition by the court because there was some question as to their appointment that was raised by the CFTC and its receiver. So those are the types of things, and the court would ultimately have to approve any disposition of assets and the like. I understand, but there was no- Was there a process of the court ever issued to gather the assets or anything of that nature? Yes, Your Honor. My understanding, and this is pursuant to BVI law, and I'm not a BVI lawyer, but my understanding is that, pursuant to the law, the court did authorize them and direct them to go and recover the assets. Yes, Your Honor. Of the BVI funds. And the district court itself concluded that the defendant's removal from a position of authority over the BVI funds had, in the words, I quote, the district court, alleviated concerns regarding the withdrawal or misapplication of funds entrusted to the defendants. Thus, by the filing of our motion to modify, the legal and equitable justification for the injunction had disappeared. And we contend that what remains is an unlawful asset grab by the CFTC and the receiver of innocent non-party assets, which has delayed and frustrated the ongoing liquidation proceedings that are currently supervised by the high court in Branchburg. What precisely is the loss that is incurred from waiting for a final distribution order? Well, Your Honor, I think the problem is that the seizure itself is without a legal basis. No, I wish you would address my question. Sure. I ask concretely, what is the loss from waiting for a final distribution order? Well, it's unclear at this point in time what the loss is. No, I didn't see you arguing in your brief that there was any loss from waiting. Well, Your Honor, we do believe it's an illegal seizure. I understand that you argue that it shouldn't have occurred, but I'm trying to figure out whether there's any loss. Now, I could imagine a loss if, for example, the funds are currently being poorly invested, if they're being invested in low return opportunities compared to what they would be. But I don't understand you to be arguing that. Am I correct? Well, actually, Your Honor, part of the funds where there is a seizure going on in Guernsey, that was part of the funds are in securities and are not liquid. The funds of the disputed assets that we are talking about, the loss is it could be a loss to the BVI funds in terms of how the ultimate distribution is done by the district court or whether the funds are distributed under the laws of the BVI, as the investors in those funds anticipated they would be. I realize the court is very familiar with the underlying facts, but I want to emphasize two factual points which I don't believe are in dispute before addressing the district court's opinion specifically. First of all, the underlying fraudulent conduct that's alleged in this case, the misrepresentations and the misappropriations were directed by the defendants towards the PIWM investors. And those are indirect investors in the alliance fund, which is then an investor in the BVI, in the British Virgin Islands funds, which were seized. The PIWM investors had only an indirect investment in alliance and represented at most a minority position in the five BVI funds which had been seized and in fact had no investment in the remaining two BVI funds. Moreover, alliance was merely one of roughly 29 investors. And there is no evidence in the record that the BVI funds ever engaged in any improper or wrongful conduct or that they were ever used or operated as anything other than lawful investment funds under the BVI law and their own governing documents. The district court, in maintaining the seizure of these assets, relied principally on two factual conclusions to support its denial of the motion to modify. First, there was a factual finding made by the district court that the BVI funds furthered the scheme. In several places in the opinion without citation to the record, the district court states that the defendant, Batou, exercised his control over the funds in furtherance of the fraudulent scheme. Not only is there no citation in the record for that allegation, but the allegations themselves were never made by the CFTC in either their complaint or the underlying affidavit or anywhere in the preliminary injunction motion or order. Nor is there, the CFTC does not even allege that the BVI funds or any of their investors were ever involved in the fraudulent conduct. So what we have here is a situation with no allegations of wrongdoing by the BVI funds and no allegation that these are, in fact, any proceeds or fruits of a crime. At most, what they are are the PIWM victim's indirect investments in the BVI funds. The second point that the court relied upon was the notion that there was commingling in this case. The district court stated that this commingling, in and of itself, required a seizure. And the district court finally concluded that because it was impossible at the stage to calculate, much less carve out any one investor's share, that that, yet again, was another reason why the funds should continue to be seized. But, in fact, there is no dispute as to what alliances share in the various BVI funds, which the district court itself sets forth. And even if the district court were correct in its finding that there was commingling and it was in some way improper, that would not justify the seizure in this case. I want to just go right now to the law, which the district court, which governs the notion of seizure. I think the most relevant case in this is SEC v. Black, which is a Third Circuit case from 1998, where Justice Alito was on the panel at the time. That case also involved the district court modifying a freeze order for certain investor accounts that, like the accounts in the BVI, were controlled by the defendants in that case. But the court concluded that the owners of the funds were not culpable. And since the property did not belong to the defendants, there was no legal basis to seize that property. In fact, the Black court relied heavily on this court's opinion, and this court's holding in SEC v. Sharif, 933 F. 2nd 403 from 1991. In Sharif, this court recognized that there is nothing in the case law or the statutes that, quote, authorizes a court to freeze the assets of a non-partner, one against whom no wrongdoing is alleged. This court recognized that the only options open to the SEC in that particular instance were either to join the non-party as a nominal defendant, or if it truly believed the assets were illegally obtained profits to which the owner had no legitimate claim, then it could, in fact, name the owner as a defendant in the case. And neither of those alternatives is appropriate here, where the CFTC has not and cannot dispute the actual ownership of the BVI liquidators to these funds. Even the district court has recognized that. And the court has already concluded that the BVI liquidators have never been acting in concert with the defendants and that there is no longer any risk of additional wrongdoing for devaluation of the funds. So I think our argument, just to be clear, is not that in the ultimate distribution that there will be, that the BVI funds will ultimately be harmed by that ultimate distribution in terms of a dollar figure. Our argument here is there is no basis at this point in time to continue, there is no legal basis for the CFTC, for the government, to continue to seize funds of a non-party who is not accused of any wrongdoing. The district court briefly does address the case of SEC versus Black. In the way the district court interprets Black, it interprets Black to say, well, the fact that the defendants controlled, at one point in time, the assets in the funds is in and of itself sufficient to warrant the seizure. But if a careful reading of Black shows, that's not in fact what happened. What happened in Black is that, and just to be clear, in Black, there were actual allegations of wrongdoing and wrongful commingling amongst the funds. But what the district court and the SEC agreed with this at the time, what the district court concluded is because at least three of the funds the defendant no longer controlled, those funds had to be released and there was no legal basis to continue to hold those funds. As to the fourth fund, the reason the fourth fund was not released was not, as the district court suggests, that the defendants had controlled those funds. The reason the fourth fund was not released was because that fund was still being held in the name of the defendant and the court concluded the defendant still had control over and it was still arguably the defendant's asset. So, first of all, the commingling, even wrongful commingling, did not entitle the SEC, the government, to continue to seize those assets. In addition, the fact that there was control, and if you look at the facts in SEC versus Black, there is no difference in terms of the type of control that the defendants had over those assets as the defendants had in these assets in the BVI funds. So, the fact the defendants did at one time control those assets and control the investment decisions of those assets had no legal effect after the defendants were taken out of control. The only thing that had legal effect as far as the court was concerned was whether or not the defendants still controlled and maintained arguably ownership of that remaining C fund. And so, I think we're in a situation here where there is no dispute that the facts have changed. These funds are no longer under the control of a defendant. There is no longer a risk of the assets being depleted. There is no longer a risk of any wrongdoing. And at this point, there is no legal basis that the CFTC can articulate or has articulated to continue to hold those funds based on the fact that either, but two, the defendant at one point did control the funds, or the fact that those funds were in the district court's terms, co-ming. And I want to explain one thing about the funds which is in the record, is these funds are, they are BVI mutual funds. They're in essence, in theory at least, no different than U.S. mutual funds. In the notion that there are a number of pooled investments that are made in individual or particular organization's names, and in exchange for those investments, they are given a share of the proceeds if and when they make a distribution or those funds are liquidated. The notion that there is co-mingling in a mutual fund, that there is anything inherently wrong or suspect about that, is simply not based on the law. So for this reason, we would urge this court to find that the preliminary injunctions should not be intended, were not intended and should not be used by the government as substitutes for forfeiture or traditional asset recovery. There is no legal basis for the continued seizure of property from innocent non-parties absent a finding that they were involved in the fraudulent scheme or there was a risk of ongoing violations. Because neither fact existed in relation to BVI funds, we would ask this court to reverse the district court's order denying the modification of the preliminary injunction with directions to immediately release the disputed assets. Thank you. Thank you, Mr. Sussman. Ms. Puri. Good morning, Your Honors. May it please the Court, my name is Kavitha Kumar-Puri and I'm here on behalf of APALE, the Commodity Futures Trading Commission. With me at counsel's table is Amanda Burks from the Division of Enforcement. Your Honors, I wanted to take a couple of the points my colleague made before going into the thrust of my argument. First, I wanted to address this idea that this was somehow an illegal seizure by the commission and the receiver. The BVI liquidators were appointed after the preliminary injunction. That is true. However, the BVI funds appeared at the September 24, 2012, hearing for the preliminary injunction. It was Mr. Peter Cooper, on behalf of the BVI funds, he did not make a formal notice of appearance. However, he did say on the record, and this is at docket 148, the transcript at pages 3 and 4, he did say on the record that the BVI funds had a superior legal and beneficial interest in some of the assets that were going to get swept into the asset freeze and into the receiver's control. The district court took note of that objection and a few pages later, on pages 8 and 9 of that same transcript, asked the commission whether it was still appropriate to appoint a receiver in light of the BVI funds' objection that they would have a superior legal and beneficial interest in some of the assets. The commission responded that it makes sense to go ahead and appoint a receiver and that they can come in at the claims process. At this point, it made sense to go ahead and appoint a receiver to gather the assets. So the district court heard the substance of that objection, asked the commission whether it was appropriate, and then responded, you make a good point, and entered the asset freeze in the preliminary injunction in the form that it is being challenged here currently by the BVI liquidators. So I just wanted to allay the concern that this was somehow an illegal or unthoughtful asset freeze. Two, with respect to the fact that the danger has dissolved. Conceitedly, the danger that Mr. Battu now controls the BVI funds has changed. It has changed hands. We do not argue that the BVI liquidators are acting in anything other than accordance with their court-appointed duties. However, the preliminary injunction and asset freeze was not only instituted to take care of the further fraudulent conduct issue. It was also to preserve the assets going forward for the return to the defrauded investors. And the BVI liquidators' appointment does nothing to change that concern. In fact, if you look at the BVI, I'm sorry, not BVI, British Virgin Islands liquidators' brief at page 18 or their motion to intervene at page 7, they make clear that they purport to represent creditors, direct creditors of the British Virgin Island funds, who would receive priority under BVI insolvency law. That, to me, would dissipate the assets available for distribution to the defrauded investors for whom this proceeding was instituted as a protection. So while Mr. Battu's control over the funds is no longer true, the district court still has an interest in enforcing its judgment as to preventing dissipation of these assets. I did want to also address your question, Judge Ripple, about what is the loss to the British Virgin Islands liquidators. They have not proved any harm here. They have not conclusively established that they own these assets, nor have they established that the delay in returning to them itself constitutes a harm. And, in fact, the British Virgin Islands liquidators, at page 9 and 10 of their reply, cite a case for standards, Smith v. SEC, from the Second Circuit in 2011. That is sort of what I would think of as the quintessential case where you argue delay itself constitutes a harm. There the SEC came in. They asked the court to lift the asset freeze because part of the assets was a house. The owner was no longer making payments on the house. The housing market was in decline. The asset was losing value. And so there, in order to prevent dissipation, you actually had to lift the asset freeze, get the money out of the house to preserve the assets for eventual distribution to the defrauded investors. That is not the case here. And with apologies to my colleague, if I misunderstood his answer, I understood him to say some of the Guernsey assets are in the form of securities. The Guernsey assets are not the subject of this appeal. And so, to my understanding, the four categories of disputed assets are all in the form of cash. I also wanted to take on this idea that the BVI funds were not used in furtherance of the fraudulence. It seems a very strange way to invest assets. Keeping them in cash for the time being? Yes. That's what I would have expected the liquidators to argue, that the assets are being underemployed, that their investors are not earning an ordinary rate of return on them. But the liquidators have made no such argument. But that seems to be a serious potential problem with delay. Your Honor, I understand the objection, certainly, and I would hope that the receiver is not showing... It's not an actual objection, it's a concern. I understand your concern, and I would hope that the receiver is keeping the assets in a way that best preserves their value. Frankly, because it's not been an issue in this litigation, I'm not entirely sure what the receiver is doing with the assets in terms of holding them. But the BVI liquidators certainly have not put at issue the manner of their holding. And having failed to put it at issue, I find it hard to believe that the district court abused its discretion in maintaining the status quo. They never made that objection, the kind of objection that was made in Smith v. SEC. And I did want to take on this point that the BVI funds never operated in an unlawful manner. This case is similar to Scholes v. Lehman, which is a case from this circuit that the British Virgin Islands liquidators cite in their opening brief. In that case, this court asked the question, when you have a legitimate investor in funds, but the funds were so controlled by a fraudster and contained investments that were solicited through fraudulent means, what is the moral claim of that other investor to profits generated from the fraudulent scheme? Like that case here, the district court found, and this is a page A7, appendix A7, page 7 of its opinion, that the defendants thoroughly controlled the BVI funds, this is not at issue, and that they could use that control, they could use the BVI funds in furtherance of their fraudulent scheme. The district court further found that it made some 800 inter and intra fund transfers. So it is a little hard to imagine that the BVI funds had some personality distinct from the individual who controlled them and, in fact, used them in furtherance of his fraudulent scheme. And I did not understand the British Virgin Islands liquidators to be challenging that fact-finding of the district court or to be saying that that fact-finding was an abuse of the district court's discretion. With regards to SCC v. Black and SCC v. Cherif, the first from the Third Circuit and the second from the Seventh Circuit, I wanted to take SCC v. Cherif first. I understood the opinion to be saying that if the wrongdoer, that is Cherif, was using his relative's bank account, if he actually thoroughly controlled that bank account, then the injunction should stay. If he didn't, if, in fact, the relative, who I believe's name was Sun Shu, if he was complicit in the fraud, then the injunction had to be lifted because there was a lack of subject matter jurisdiction. So they had to then lift the injunction, name the co-conspirator, and then reissue the injunction. So the operative issue in both of those cases is control, and that control here is undisputed, that Mr. Battu and his co-defendants controlled the BVI funds and used them during the course of their fraud. I also wanted to address my colleague's point about the PIWM alliance investors being minority investors. There are many ways to carve up this pie. The British Virgin Island liquidators have given us one way by share classes. They have also said that they were one of 29 investors in the British Virgin Islands funds. However, if you look at the complaint, the complaint alleges, and the facts are now taken as true, although I will admit they are being fine-tuned as the litigation goes on, Mr. Battu and his co-defendants solicited some $340 million worth of investments from 800 investors, individual investors worldwide. It is believed that about 250 of those investors were from the United States who contributed about $217 million of total investments. And so that's about two-thirds of a $340 million total solicitation. So there are many ways to carve up this pie, which is why we don't have enough facts in the record at this point, I think, to make a determination essentially about distribution, which is really what I understand the British Virgin Islands liquidators to be arguing about. And if there are no further questions from the Court, for all of these reasons we respectfully request that the decision below be affirmed and that this Court find the District Court did not abuse its discretion in maintaining the status quo. Thank you. Thank you, Counsel. Anything further, Mr. Sussman? Yes. Your Honor, I'd like to respond to a few points. First off, we are not here because we don't like the way the pie is being distributed. We are here because our claim is it is not their pie to distribute. We are not claiming it was an illegal seizure when Judge Chang entered the order. What we are saying is it is currently an illegal and unauthorized seizure since Mr. Batou no longer has control over those assets. I disagree with my colleague's reading of Sharif. I think what Sharif is dealing with, granted, is control, but it is not looking at control before when the injunction is entered and then saying, well, that's enough to equal control from then on. What Sharif is looking at is saying, okay, who is actually in control of the assets at this time? And because the Court was not convinced that Sharif was in control of the assets, the Court would not authorize the seizure of those assets. I want to come back to Judge Easterbrook's point again about the harm here. Judge, I think the harm here that we're arguing is these are not the CFTC's funds. They're not the funds of the receivership. Whether those assets could be invested in – I must say, according to the District Court, that is the very thing the District Court says I'm going to come to in the future. Who is the ultimate owner of these funds is a matter not yet determined by the District Court. All due respect, Your Honor, I disagree with that. I think the record, and we've cited a number – Your point is the District Court should have made that decision now rather than postponing it. But usually the timing in which decisions are made is within the discretion of the District Judge. I disagree. Unless there's harm from waiting, and you haven't argued there's any harm. Well, Your Honor, I disagree. I don't think the District Court is saying we're going to wait until the ownership issue is decided. The Judge said that explicitly. Your Honor, I would refer you to our reply brief at footnote 3 where there are ample sites in the record where the Judge does recognize that the BVI funds own those funds. I mean, let's break this down for one second. The PIWM investors are indirect investors in another broker deal that then invests in these mutual funds as a small minority investor. These are mutual funds that are being held in the British Virgin Islands in accordance with the British Virgin Islands law, just like Dreyfus is being held in the U.S., okay? And so what they are saying, it is clear that the BVI funds are in liquidation in the same way if Dreyfus is in liquidation. Who owns it? Well, if a U.S. court finds that the bankruptcy trustee is running Dreyfus, then the bankruptcy trustee owns Dreyfus. The same thing has happened, and the Judge has determined that the ownership of the BVI funds is with the BVI liquidators. So I see my time is up. I just want to emphasize that our issue here is not how the assets are distributed. Our issue here is whether there is a legal right to seize those assets now that the defendants are no longer in control of those assets. Thank you, Your Honor. We would urge you to reverse the decision of the district court. Thank you very much. The case is taken under advisement.